**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**BRIAN STEPHENS** **PLAINTIFF**
***ADC #150292***

**v.** **No. 4:25-cv-00881-PSH**

**SHEILA K. ARMSTRONG, *et al.*** **DEFENDANTS**

# MEMORANDUM OPINION AND ORDER

## I. Introduction

Plaintiff Brian Stephens, an inmate at the Arkansas Division of Correction's (ADC) Wrightsville Hawkins Unit, filed this *pro se* 42 U.S.C. § 1983 action on August 28, 2025 (Doc. No. 2). He filed an amended complaint on October 16, 2025 (Doc. No. 7). Stephens' application to proceed *in forma pauperis* was granted, and service was ordered on defendants Health Services Administrator Sheila K. Armstrong and APN Aric Simmons (the "Defendants"). Doc. Nos. 3 & 8.

Before the Court is a motion for summary judgment, brief in support, and a statement of undisputed facts filed by the Defendants, claiming that Stephens did not exhaust available administrative remedies before he filed this lawsuit (Doc. Nos. 10-12). Stephens filed a response and statement of disputed facts (Doc. Nos. 16-17). For the reasons described below, the Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". Fed. R. Civ. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is

genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

## III. Analysis

The Defendants argue they are entitled to summary judgment because Stephens failed to exhaust available administrative remedies with respect to his claims before he filed this lawsuit. *See* Doc. No. 11. In support of their motion, the Defendants submitted the declaration of Brandy Johnson, the ADC's Medical Grievance Supervisor (Doc. No. 12-1 at 1-2); a copy of Grievance GR-24-00418 (*id.* at 3-5); a copy of Grievance HA-25-00022 (*id.* at 6-8); a copy of Grievance HA-25-00043 (*id.* at 9-11); and a copy of the ADC's grievance policy, Administrative Directive 19-34 (Doc. No. 12-2).

### *A. Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act (PLRA) requires an inmate to exhaust prison grievance procedures before filing suit in federal court. *See* 42 U.S.C. §1997e(a); *Jones v. Bock*, 549 U.S. 199, 202 (2007); *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014). Exhaustion under the PLRA is mandatory. *Jones v. Bock*, 549

U.S. at 211; *Hammett v. Cofield,* 681 F.3d 945, 949 (8th Cir. 2012). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA does not prescribe the manner in which exhaustion occurs. *See Jones v. Bock*, 549 U.S. at 218. It merely requires compliance with prison grievance procedures to properly exhaust. *See id*. Thus, the question as to whether an inmate has properly exhausted administrative remedies will depend on the specifics of that particular prison's grievance policy. *See id*.

Pursuant to the ADC's grievance policy, Administrative Directive 19-34, inmates are provided Unit Level Grievance Forms as part of the Inmate Grievance Procedure. *See* Doc. No. 12-2 at 5. To resolve a problem, an inmate must first seek informal resolution by submitting a Step One Unit Level Grievance Form within 15 days after the occurrence of the incident. *Id.* at 1-2, 7. Inmates are to "specifically name each individual involved" so that the ADC may complete a proper investigation and response. *Id*. at 5. The policy provides that only one grievance form

> can be submitted per grievance and only one problem/issue should be stated in the grievance, not multiple problems/issues. An inmate must use a separate form for each issue. Only one issue will be addressed. Additional problems/issues contained in the grievance will not be considered as exhausted.

*Id*. An inmate must be "specific as to the substance of the issue or complaint to include the date, place, personnel involved or witnesses, and how the policy or incident affected the inmate submitting the form." *Id*. at 7.

A problem solver investigates the complaint and provides a written response at the bottom of the form. *Id.* at 7-8. If the inmate is not satisfied with the resolution or the problem solver does not respond within three working days, he may then complete Step Two of the grievance procedure and submit the form as a formal grievance. *Id.* at 8. If a formal grievance is medical in nature, it is forwarded to the appropriate medical personnel for response. *Id.* at 10.

The inmate should receive a Response to the Unit Level Grievance Form (Attachment III or IV depending on whether the grievance is medical in nature), or an Acknowledgement or Rejection of Unit Level Grievance (Attachment II). *Id.* at 10-11. If the inmate receives no response, or if the inmate is not satisfied with the response, the inmate can then appeal to the Deputy Director for Health and Correctional Programs. *Id.* at 12. An inmate's appeal must be written in the space provided on the Response to Unit Level Grievance Form (Attachment III or IV) or the Acknowledgment or Rejection of Unit Level Grievance (Attachment II). *Id.* at 12. The inmate must include the original Unit Level Grievance Form (Attachment I) and either the Response to Unit Level Grievance Form (Attachment III or IV) or the Acknowledgement or Rejection of the Unit Level Grievance (Attachment II)

with his appeal. *Id.* If an inmate fails to submit either of the two pages with his appeal, the appeal may be returned to the inmate as rejected. *Id.* The grievance procedure further provides that in order to complete an appeal, "the inmate must state a reason for the appeal, and must date, sign, and write the inmate's ADC number on the attachment being appealed." *Id.*

Once the Deputy Director responds or the appeal is rejected, the grievance process is complete. *Id.* at 13. According to the ADC's grievance policy, the entire grievance procedure should be completed within 76 working days absent an extension or unforeseen circumstances. *Id.* at 14. The grievance policy specifically states that inmates must exhaust administrative remedies at all levels of the procedure before filing a federal civil rights lawsuit. *Id.* at 19.

### *B. Stephens' Complaint Allegations*

In his Amended Complaint, Stephens alleges he experienced blood shot eyes, loss of sight, and eye pain while incarcerated at the Grimes Unit. Doc. No. 7 at 4. He claims that after submitting a sick call in January 2024, Defendant Simmons told him he probably had cataracts, there was nothing he could do, and denied him any treatment. *Id.* at 4-5. Stephens claims he submitted a grievance regarding Simmons, and Defendant Armstrong (whom he claims is Simmons' mother as well as the Health Services Administrator) responded to his grievance and called him into her office on January 31, 2024. *Id.* at 5. He alleges she told him not to write grievances

on her son, shouted at him, and "told him that she 'don't give a shit how bad [he is] suffering, [he's] not going to get any help and nobody gives a shit about [him].'" *Id.* Stephens further alleges that Armstrong told him he "better not even submit another sick call…", forced him to sign a refusal form under duress, and threatened to lock him up in isolation if he did not sign it. *Id.* at 5-6. He claims that after he signed the form, Armstrong told him he would regret it if he filed any more grievances on her son. *Id.*

Stephens alleges he submitted a couple more sick calls after that, but no action was taken. *Id.* He claims that an eye doctor examined him on February 27, 2024, and noted his cornea appeared to be "splitting up and it's very concerning," but could not provide treatment. *Id.* at 7. Stephens alleges he then experienced worsening symptoms on March 27, 2024, including swelling, bleeding and looking as if he had been shot in his eye. *Id.* He states he was sent to the infirmary by security staff for emergency medical treatment, but the Defendants intercepted him and "sent him back to where he came from without triage or treatment." *Id.* He claims that once the Defendants went home for the day, his "eyes continued to get worse and look like they were about to explode." *Id.* at 8. He was sent back to the infirmary that night where he received eye drops before returning to his housing area. He states he was again called back to the infirmary so that a number of staff members could look at him. *Id.* The shift supervisor called in the chief of security, who had gone home

for the day. *Id.* at 8. The security chief arrived at the infirmary around 10:00 p.m. that night, looked at his eye, and ordered that Stephens be taken to the hospital immediately. *Id.* at 8-9. Stephens claims he was first seen in the Emergency Room at the hospital in Newport, Arkansas, where the doctor there told him he needed emergency surgery because of the amount of pressure in his eyes. *Id.* at 9. He was transferred by ambulance to the University of Arkansas for Medical Sciences (UAMS) in Little Rock, Arkansas, where he arrived around 1:00 a.m. on March 28. *Id*. At UAMS, the pressure in Stephens' eyes was relieved and he was placed on the list for a cornea transplant. *Id.* He was prescribed several medicated eye drops and an eye ointment and was discharged the morning of March 28. *Id.* at 10.

Stephens states that after he returned to the Grimes Unit on March 28, the Defendants were very angry and would not "talk to, meet with, or look at [him]." *Id.* at 10. Stephens further alleges they arranged to have him transferred to another unit out of "spite and retaliation." *Id.* He was transferred to the North Central Unit on April 4, 2024. *Id.* Stephens claims he received better care at the North Central Unit and underwent a cornea transplant in December 2024 after a cornea donor was found. *Id.* at 11.

Stephens was then transferred to the Wrightsville Hawkins Unit on January 15, 2025. *Id.* He is critical of the medical care he received there for his eye, including failure to remove his stitches and not receiving his eye medicine, causing

him to "go completely blind." *Id.* Despite these criticisms, Stephens does not make any claims in this lawsuit at this time regarding his treatment at the Wrightsville Hawkins Unit. *Id.* at 12.

### *C. Stephens' Relevant Grievances*

In her declaration, Medical Grievance Supervisor Brandy Johnson stated that she searched Stephens' medical grievance history for the time period of January 2024 through October 2025, when the amended complaint was filed. Doc. No. 12-1 at 1, ¶ 4. She identified three medical grievances filed during that time period: GR-24-00418, HA-25-00022, and HA-25-00043. *Id.* Only GR-24-00418 (described below) relates to Stephens' complaint allegations in this case.[1]

Stephens submitted GR-24-00418 on March 30, 2024. Doc. No. 12-1 at 5. He grieved, in relevant part:

> . . . On my behalf, I wrote 3 grievances and multipole requests on the kiosk but 1-31-24 I was told by medical not to fill out any more request forms on the kiosk and that I would not be seen by a doctor, this was and is medical malpractice since a non-diagnosis resulting from failure to exercise ordinary knowledge, skill, and care does constitute malpractice and now I have had 2 visits to U.A.M.S. Eye Clinic and it has been determined that I have to now have a cornea transplant due to this lack of earlier medical treatment.

---

[1] In HA-25-00022, Stephens grieved chronic pain treatment by non-party Maria Lane and the denial of his request for an extra mattress. *See* Doc. No. 12-1 at 8. In HA-25-00043, Stephens grieved his inability to review his medical jacket. *Id.* at 11.

*Id.* This grievance was denied as untimely on April 2, and Stephens filed a formal grievance that same day. *Id.* The formal grievance was marked as received on April 3. *Id.* at 4-5. The ADC Inmate Grievance Coordinator prepared an Acknowledgement or Rejection of Unit Level Grievance that same day, indicating the grievance was rejected as untimely and notifying Stephens of his right to appeal to the Deputy Director. *Id.* at 4. Stephens appealed, and the documents indicate the appeal was received by the Deputy Director on April 12 (after Stephens was transferred). *Id.* In his appeal, Stephens stated,

> I am appealing this decision of untimeliness, because I could not know about the medical malpractice until after I saw the doctors at U.A.M.S. as I only thought that I had pink eye as I was told by medical personnel here at Grimes Unit. Due to their negligence and wanton disregard I now have a situation of serious medical need that could have been resolved with on a eye transplant.

*Id.* On April 15, the Deputy Director rejected the appeal on grounds that step two was appropriately rejected. *Id*. at 3.

### *D. Exhaustion of Stephens' Claims*

Stephens asserts in both his amended complaint and his response to the Defendants' motion that administrative remedies were unavailable to him because defendant Armstrong threatened to both prevent him from receiving further treatment and to place him in isolation if he submitted another grievance concerning treatment by Simmons. Doc. No. 7 at 5-6; Doc. No. 16 at 2-3. An inmate need only exhaust *available* administrative remedies. *See East v. Minnehaha Cty.*, 986 F.3d

816, 821 (8th Cir. 2021). "Administrative remedies are not available if 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Id.* (quoting *Ross v. Blake*, 136 S.Ct. 1850, 1860 (2016)). Administrative remedies may also be unavailable if prison officials prevent inmates from utilizing the grievance procedures or fail to comply with such procedures. *See Gibson v. Weber*, 431 F.3d 339 (8th Cir. 2005); *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001).

The Defendants argue that GR-24-00418 does not serve to exhaust Stephens' claims because it was rejected at Step Two and on appeal. Doc. No. 11 at 2-3. The Court also notes that Stephens did not specifically name Simmons or Armstrong in this grievance. However, Stephens alleges that he did not submit more grievances after January 2024 because defendant Armstrong had threatened him, thereby making the grievance procedure unavailable to him during that timeframe. He did not submit another grievance until he had been taken to UAMS and received a diagnosis. And he did not name Simmons or Armstrong, corroborating his allegations that he had been threatened by Armstrong not to file another grievance naming her son.

The Defendants have not addressed or refuted Stephens' allegation that the grievance procedure was unavailable to him. As noted earlier, "Administrative remedies are not available if 'prison administrators thwart inmates from taking

advantage of a grievance process through machination, misrepresentation, or intimidation[.]'" 986 F.3d at 821. Based on Stephens' allegation that he was prevented from grieving the Defendants' actions between January and April 2024, the Court finds there is a material issue of fact as to whether administrative remedies were available to Stephens during this timeframe. It therefore does not matter that GR-24-00418 was rejected as untimely.[2] Stephens' claims against the Defendants based on their involvement with his treatment for eye complaints at the Grimes Unit from January 2024 through March 28, 2024, when he was seen at UAMS, may therefore proceed at this time.

However, Stephens' claim that the Defendants had him transferred to another unit out of "spite and retaliation" after he returned on March 28, 2024, is not exhausted. *See* Doc. No. 7 at 10-11. There is no evidence that Stephens grieved his transfer, or the Defendants' role in it, after he was transferred to the new unit. He did not file another grievance concerning his medical treatment until March of 2025, when he complained about pain treatment and not receiving an extra mattress. *See* Doc. No. 12-1 at 8 (HA-25-00022). Accordingly, Stephens' claims against the Defendants based on his allegation that they retaliated against him by having him

---

[2] The Court also finds Stephens' argument that this grievance was not untimely to be persuasive – he specifically grieved that he had been denied medical treatment continuously and had only just learned he needed an eye transplant. Because his grievance was denied as untimely, this particular complaint was not answered on the merits, through no fault of Stephens.

transferred to the North Central Unit, should be dismissed without prejudice for failure to exhaust available administrative remedies.

## IV. Conclusion

A fact issue exists as to whether administrative remedies were available to Stephens with respect to his claims stemming from the Defendants' treatment of him at the Grimes Unit from January through March of 2024. However, Stephens' claim that the Defendants transferred him to the North Central Unit out of retaliation is not exhausted. Accordingly, the Defendants' motion for summary judgment (Doc. No. 10) is GRANTED IN PART and DENIED IN PART. Stephens' retaliatory transfer claim is dismissed without prejudice for failure to exhaust available administrative remedies. His other claims will proceed.

IT IS SO ORDERED this 9th day of September, 2026.

UNITED STATES MAGISTRATE JUDGE